IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NIAMA REED,                              )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )  Civil Action No. 1:24-cv-212 (RDA/WBP)
                                         )
METROPOLITAN WASHINGTON                  )
AIRPORTS AUTHORITY,                      )
                                         )
        Defendant.                       )

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Metropolitan Washington Airports Authority's Motions for Summary Judgment (Dkt. 28) (the "MSJ") and to Strike (Dkt. 41) (the "MTS"). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motions together with the Memoranda in Support (Dkts. 29, 42), Oppositions (Dkts. 38, 39, 45), and Replies (Dkt. 40, 46), this Court DENIES the MTS and GRANTS the MSJ for the reasons that follow.[1]

I. PROCEDURAL BACKGROUND

Plaintiff Naima Reed originally filed her complaint in the Circuit Court for Arlington County. Dkt. 1. On February 13, 2023, Defendant Metropolitan Washington Airports Authority removed the case to this Court. *Id*. That same day, Defendant filed its Answer. Dkt. 4.

Plaintiff subsequently sought, and was granted, leave to file an Amended Complaint, which Defendant again answered. Dkts. 7, 11, 12, 13. Thereafter, a Scheduling Order issued. Dkt. 15.

---

[1] Except with respect to citations to deposition testimony, all page number citations refer to the CM/ECF assigned page numbers.

After a period of discovery, the parties sought to extend case deadlines, in part because Defendant had outstanding responses to Plaintiff's discovery requests. Dkts. 18, 19. That request was granted in part and denied in part. Dkt. 27.

On April 11, 2025, Defendant timely filed the MSJ. Dkt. 28. On April 23, 2025, Plaintiff sought and was granted an extension on her response deadline as well as the attendant request to compel supplementary responses to certain discovery requests. Dkts. 32, 37. On May 9, 2025, Plaintiff filed her Opposition. Dkt. 38. On May 12, 2025, Plaintiff filed a Notice which contained additional exhibits relevant to her Opposition that were not originally attached. Dkts. 39, 39-1 to 39-19. On May 15, 2025, Defendant filed its Reply. Dkt. 40.

The next day, Defendant filed the MTS seeking to strike the additional exhibits filed on May 12, 2025. Dkt. 41. On May 22, 2025, Plaintiff filed her Opposition. Dkt. 45. On May 27, 2025, Defendant filed its Reply. Dkt. 46.

## II.     MOTION TO STRIKE

Before the Court can properly assess the MSJ and any related facts, the Court must first determine whether the exhibits contained in the May 12, 2025 Notice (the "Late Notice") are appropriately considered part of the summary judgment record. Pursuant to Magistrate Judge William B. Porter's April 25, 2025 Order, Plaintiff was required to file any opposition to the MSJ on or before May 9, 2025. Dkt. 37. Plaintiff complied with this portion of the Order, but Plaintiff failed to timely file the exhibits relevant to that Opposition, which is now the subject of the MTS.

Neither party cites any Rule or applicable authority regarding the standard governing a motion to strike. Thus, the Court examines the possible bases for a motion to strike. Rule 12(f) relates only to "pleadings," which does not include the briefing that is presently at issue. *See* Fed. R. Civ. P. 7(a), 12(f). Nevertheless, this Court has the inherent authority and discretion to strike an

2

unnecessary or unwarranted submission. *See, e.g.*, *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 149-50 (4th Cir. 2009); *Dietz v. Bouldin*, 579 U.S. 40, 47, (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.").

Although the Court certainly could exercise its discretion to strike the late-filed exhibits, the Court will not, as the Fourth Circuit has a strong preference "in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). Here, Defendant received a lengthy extension of time in which to submit the MSJ, and to complete its production of discovery to Plaintiff. Plaintiff also received an extension of time to file, but not as lengthy of an extension. Additionally, the exhibits were filed a mere three days late, and Defendant does not assert that it was in any way prejudiced by the delay. Thus, given the Fourth Circuit's preference for merits-based resolution, the failure to identify any prejudice, and the failure to rely on any specific authority, the Court chooses to exercise its discretion not to strike the late-filed exhibits, and the Court will deny the MTS.

III.    UNDISPUTED STATEMENT OF FACTS

Before analyzing the MSJ at issue here, the Court must first determine the undisputed summary judgment record, as summary judgment is only appropriate where there are no genuine disputes of material fact. Defendant complied with the Rules governing the procedure by which to set forth undisputed facts, but Plaintiff did not. The Federal Rules of Civil Procedure require a non-moving party to dispute asserted undisputed facts by citing to particular parts of materials in the record or by showing that the materials cited do not support the asserted fact. Fed. R. Civ. P. 56(c). Although Plaintiff, represented by counsel, responded to each enumerated paragraph asserted by Defendant, Plaintiff often failed to cite supporting evidence in the record. This does

3

not comply with the Rules.[2]   Indeed, by not appropriately responding to the MSJ, which was supported by declarations and other evidence, Plaintiff has failed to dispute the asserted facts and leaves those facts uncontroverted.   This, of course, does not answer the ultimate question of whether such uncontroverted facts entitle Defendant to judgment as a matter of law, which the Court analyzes *infra*.  *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993).

The Court has reviewed the parties' submissions and determined that the following facts are undisputed:

1. In 2004, Plaintiff began her employment with Defendant's police department at the lowest rank, as an "Officer."  She progressed steadily through four ranks, to that of "Major," and maintained the rank of Major until her employment ended in September 2021.[3]

2. The rank of Major was only two ranks below Chief of Police, the highest rank within the department.

3. Reed complains that she was discriminated against because she was excluded from things that her white, male counterparts were included in, that she was not treated the same as

---

[2] Indeed, the Opposition not only failed to comply with the Rules by failing to cite to specific evidence in the record when attempting to dispute asserted facts, but the Opposition also set forth her own facts in narrative form (here, relying on evidence in the record) which is not squarely contemplated by the Rules.  Moreover, the Opposition contains typographical errors, statements made in the first person, and placeholder citations.  *See* Dkt. 38 at 5 ("There were no allegations about her not knowing how to do her job until after she began engaging in protected activity in [enter year] [sic]"); *id.* at 6 ("When she got promoted, I was ecstatic . . . ."); *id.* at 14 ("I [sic] doing so . . . ."); *id.* at 18 ("CITE to NR affidavit."); *id.* at 21 ("CITE black female affidavits.").  Plaintiff's counsel is admonished to give future filings a careful review because such errors make it more difficult for the Court to conduct the necessary analysis of her filings.

On the other hand, although Defendant complied with the Rules, Defendant's asserted facts appear to follow no logical or chronological order, making it difficult to discern to what events certain asserted facts referred.

[3] Plaintiff denies that she resigned and instead argues that she was constructively discharged.  Because that is a legal determination for the Court to make, the Court has modified the asserted fact to reflect that her employment ended without determining whether it ended because of a resignation or constructive discharge.  Plaintiff also correctly notes that none of the citations provided by Defendant reflect that she resigned.  Accordingly, as modified, there is no genuine dispute of material fact.

those counterparts, and that her environment was extremely hostile. And Plaintiff specifically complained about her interactions with Major Joseph Kluh.[4]

4. Plaintiff complains that Kluh (a white male) and/or Deputy Chief Timothy Tyler (a black male) would "circumvent her authority."[5]

5. Plaintiff does not identify the ways in which Kluh or Major Moore[6] were treated differently except to assert:

    a. their inclusion in meetings in which she was not included;

    b. Plaintiff's sense that communications with her were limited to email but were not so limited with respect to her male counterparts;

    c. Plaintiff's general observation that, when she committed a policy violation, she was referred to Internal Affairs ("IA"), while others were not;

    d. Plaintiff's reference to a specific incident regarding missing rifles, where she and Moore were both investigated, but he received different discipline from her, although she does not know the results of that investigation or the basis for the discipline against him;

    e. Plaintiff's comparison between complaints against her and Kluh. Plaintiff asserts that, when Kluh had a complaint against him for discrimination, he went to mediation and did not have his unit removed from him, but she concedes she does not know whether he was the subject of any discipline. On the other hand, Plaintiff asserts that, when she was accused of workplace violence and other complaints, her mediation was mishandled and she was temporarily demoted; and

---

[4] Plaintiff asserts: "DENIED that Reed's complaints of discrimination and retaliation only consisted of complaints [sic] of her complaints of not being included in things like her white male counterparts and not being 'treated the same' and that her environment was 'extremely hostile.'" Dkt. 38 at 11. Plaintiff fails to identify any additional complaints that she made or cite any evidence in the record. Although the fact asserted by Defendant is an accurate summary of the cited deposition testimony, the Court modifies the asserted fact to include the reference to Kluh which was also included in the cited deposition testimony. Dkt. 29-1 at 34:10-35:10. As modified, there is no genuine dispute of material fact.

[5] Plaintiff asserts that she also complained that James Wasem and Chief of Police David Huchler circumvented her authority. Dkt. 38 at 11. Plaintiff again, however, cites to no evidence in the record. Accordingly, there is no genuine dispute of material fact.

[6] The parties do not provide a first name for Moore.

f.   Plaintiff's reference to an incident in February 2021, where Wasem put the onus on Plaintiff to make things right with Kluh but did not require the same of Kluh.[7]

6.   Reed asserts that the problems she experienced, which she attributes to race and sex discrimination, began when Tyler joined Defendant.[8]

7.   Reed states that all of the alleged negative treatment she was experiencing was based on the fact that she is an African American female.[9]

---

[7] Defendant's asserted fact was: "Reed does not identify ways in which Kluh or Moore were treated differently from her other than in the most generic and speculative ways, and she has no knowledge regarding what discipline, if any, to which they were subject." Dkt. 29 ¶ 5. Plaintiff objects: "DENIED that Reed did not identify ways in which Kluh or Moore were treated differently (more favorably) from her in the terms and conditions of her employment. Defendant cites only to her deposition transcript where she answered a specific question and Defendant's counsel did ask a follow [sic] in response." Dkt. 38 at 11. Plaintiff fails to cite evidence in the record and therefore her attempted dispute is not well taken. On the other hand, Defendant's commentary regarding the complaints only being made in "the most generic and speculative ways" is argument and not an assertion of fact. To the extent that Plaintiff intended to rely on her declaration that Moore was never disciplined for this incident, Plaintiff contradicts her deposition testimony which asserted that she did not know the results of the investigation and fails to state how she has personal knowledge regarding the discipline imposed on other employees. *Contrast* Dkt. 29-1 at 162:4-9 ("I just said I did not know in terms of everything that they did . . . ."), *with* Dkt. 38-1 (attesting "yet they were never punished"); *see, e.g.*, *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 n.7 (4th Cir. 2001) (noting the "long-standing principle that a party against whom summary judgment is sought cannot create a jury issue by identifying discrepancies in his own account of the facts"). Accordingly, the modified facts reflect the Court's summary of Plaintiff's deposition testimony (cited by Defendant) and Plaintiff's declaration (upon which the Court presumes Plaintiff intended to rely), and there is, thus, no genuine dispute of material fact.

[8] Plaintiff asserts: "DENIED that the race and sex discrimination against Reed began when Deputy Chief Tyler joined the Airports Authority. The race and sex discrimination began in 2008 when she was promoted to Sargeant." Dkt. 38 at 11. Plaintiff cites no authority to support her attempted dispute. In any event, Plaintiff's deposition testimony, upon which Defendant relies, supports the asserted fact. Dkt. 29-1 at 51:15-17 ("Q: Were you having any issues before Deputy Chief Tyler joined the Airports Authority? A. No. . . . ."). Accordingly, there is no genuine dispute of material fact.

[9] Defendant also asserted, based on Plaintiff's deposition testimony, that Plaintiff did not grieve a proposed demotion. Dkt. 29 at 3 ¶ 8. Plaintiff disputed this fact with citation to an email initiating step one of the grievance process. Dkt. 39-18. On Reply, Defendant noted that Plaintiff was apparently mistaken in her deposition testimony but asserts that the fact is not material. Dkt. 40 at 10. Accordingly, Plaintiff has effectively disputed the asserted fact, and it is not included in the statement of undisputed facts.

8. On December 2014, Bryan Norwood (a black male), the Vice President of Public Safety at Defendant and acting Chief of Police, approved Plaintiff's promotion to the rank of Major because of her high scores during the interview process, because he thought she had the requisite skills and potential, and because he believed it was important to promote diverse candidates. Plaintiff was promoted over a more seasoned candidate, Kluh, who had seven more years of experience and had more operational experience than Plaintiff. Between Plaintiff, Kluh, and Moore, Kluh was the last to be promoted to Major.[10]

9. After being promoted to Major, Plaintiff was provided with opportunities to grow in her leadership role. She obtained a job coach from human resources for an extended period and went to the FBI Academy at Quantico for four months. Plaintiff was provided with more training opportunities than either Moore or Kluh. Despite this training, Norwood did not observe any growth on Plaintiff's part.[11]

10. Norwood hired David Huchler (a white male) to be the current Police Chief. Before Huchler was hired, Norwood was made aware of an allegation that Huchler had used a racist slur while employed by the City of Alexandria Police Department. Norwood directed Defendant's IA to investigate the allegation, and Norwood personally interviewed the individual who made the accusation. That person,

---

[10] Plaintiff attempts to dispute the asserted fact in reliance on her own declaration. Dkt. 38-1 ¶ 2. But other than the additional fact asserted by Plaintiff that Kluh was the last Major to be promoted, nothing in her declaration disputes the facts asserted by Defendant. Accordingly, as so modified, there is no genuine dispute of material fact.

[11] Plaintiff attempts to dispute the asserted fact. Dkt. 38 at 12-13. Many of the assertions that she makes in her Opposition appear unrelated to the asserted fact or are unsupported by record citations. Those assertions do not establish genuine disputes of material fact. To the extent that Plaintiff attempts to rely on her declaration to support that she was not provided more opportunities than her white counterparts, her declaration is entirely conclusory and does not reference any specific training opportunity that they received that she did not. Dkt. 38-1 at ¶ 7. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (noting that "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence" cannot create genuine issues of material fact); *Nat'l Enterprises, Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000) (finding "self-serving affidavit" insufficient to defeat motion for summary judgment); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (plaintiff's affidavit "mostly made up of conclusory statements . . . without more is not enough to establish a *prima facie* case of discrimination"). Thus, Plaintiff's conclusory allegation is insufficient to create a genuine dispute of material fact. Moreover, to the extent Plaintiff's Opposition specifically references Kluh receiving a training opportunity in Israel, that is not reflected in Plaintiff's declaration. *Contrast* Dkt. 38 at 13, *with* Dkt. 38-1 ¶ 7. Accordingly, there is no genuine dispute of material fact.

Michael Johnson (a black male), denied that he had ever heard Huchler use the term.[12]

11. After Plaintiff was promoted to Major, she did not fulfill his expectations, nor did she (in his view) develop the necessary management skills to be a Major. Plaintiff was the subject of four IA investigations in a four-year period, all occurring after she was promoted to Major. This was unprecedented for an officer in this kind of leadership role.[13]

12. The IA role at Defendant's Police Department is established to be independent of the rest of the command structure within the Department. The Lieutenant in charge reports directly to the Chief of Police, without going through a major or deputy chief. The IA process at Defendant is similar to the process used by other police departments, in that IA is tasked with fact finding but is not tasked with

---

[12] Plaintiff asserts: "DENIED that Mr. Johnson denied ever hearing Huchler use the word, n****r. Another current MWAA employee was present at the meeting between Norwood and Huchler. She heard Johnson tell Norwood that Huchler called him a n****r. It's outrageous that Norwood now changes his story about this important fact which shows Huchler's racial animus towards Blacks." Dkt. 38 at 13. Plaintiff cites no portion of the record to support her attempted dispute. None of the documents provided by Plaintiff are a declaration from Michael Johnson. *Id.* at 3 (setting forth list of exhibits). Plaintiff says Johnson told her that Huchler did use that word, but such statements are hearsay and not admissible at summary judgment. Dkt. 38-1 ¶ 3; *Elam v. Early*, 138 F.4th 804, 816 (4th Cir. 2025) (determining that district court properly held that hearsay was "inadmissible for summary judgment purposes" and that "the Earlys cannot use what Michael heard others say to create a genuine dispute of material fact about the Rockwells' location"). Moreover, Plaintiff lacks personal knowledge as to what Johnson said to Norwood – another basis on which her declaration cannot be relied upon. Finally, the other declarations that Plaintiff provides do not include a reference to this incident. Dkts. 38-2, 38-3, 38-4, 38-5. Accordingly, there is no genuine dispute of material fact.

[13] Plaintiff attempts to dispute the asserted fact. First, she refers back to a prior statement of fact that she attempted to dispute, presumably for the proposition that Norwood put her in positions of authority and therefore could not have thought she was underperforming. Dkt. 38 at 13 ("See response to Def.'s SMF ¶ 10"). But Plaintiff provides no citation for the proposition that she was put in such positions by Norwood, and they do not appear in her declaration. The only assertion that appears in her declaration was that she was called as a witness in another discrimination case, but that does not undermine or dispute Norwood's assertion that Plaintiff did not live up to his expectations. Dkt. 38-1 ¶ 6 (asserting that she was a witness in a discrimination case). Similarly, former Human Resource Manager Deborah Lockhart's declaration stating that, in her view, when Norwood first arrived to work at Defendant, he relied on Plaintiff, does not undermine Norwood's assertions regarding how he viewed her performance as a Major. Dkt. 38-2 ¶ 3. And is consistent with him promoting Plaintiff and then later being disappointed. Plaintiff's contention that Kluh and Moore received IA complaints is unsupported by any citation to the record. Accordingly, Plaintiff has failed to provide record evidence that disputes Defendant's asserted fact, and there is no genuine dispute of material fact.

recommending discipline (which is the responsibility of the Chief). Before imposing discipline, Huchler generally consults with the head of Employee and Labor Relations, Robin Wade (a black female) and Bruce Heppen (a white male) in the General Counsel's Office.[14]

13. Personnel Investigations into Plaintiff's conduct, PI 17-029A – Manner of Exercising Authority,[15] and PI 18-005 – Conduct Unbecoming Obedience to Laws, Regulations, and Orders, were both conducted while Norwood was the Acting Chief of Police. Norwood left the decision on appropriate discipline to the incoming Chief – Huchler – in order to allow someone with no prior knowledge of the personnel involved to decide whether to sustain the charges and what level of discipline to impose.

14. In February 2021, Norwood issued a letter proposing that Plaintiff be disciplined for her conduct in April 2020, when she removed herself from a command position without direction or authorization from either the Deputy Chief or the Chief of Police. Plaintiff asserts that she was given permission to remove herself by Deputy Chief Wasem. In conjunction with this event, Plaintiff alleged that she was being discriminated and retaliated against because she is black and female. Because of this allegation, Defendant retained an outside law firm – Hunton Andrews Kurth LLP ("Hunton") – to conduct an investigation. The investigation did not support Plaintiff's allegations.[16]

---

[14] Plaintiff attempts to dispute the asserted fact but fails to rely on any record evidence. Furthermore, although Plaintiff asserts that "MWAA currently employed witnesses will testify that it was a concerted effort by ([sic] Kluh, [sic] Internal Affairs Angie King to go after her," Dkt. 38 at 14, Plaintiff does not identify those individuals nor provide any declarations or testimony from those individuals. The Court also independently reviewed the five declarations submitted by Plaintiff, and they also do not refer to this alleged relationship between Kluh and King. Accordingly, Plaintiff has failed to dispute the asserted fact and there is no genuine dispute of asserted fact.

[15] Although not directly cited by Defendant, the referenced personnel incidents reports are attached to Huchler's declaration. Dkt. 29-4. Personnel Investigation 17-029(A) related to a decision by Plaintiff to impose a performance improvement plan ("PIP") on a lieutenant without "prior documentation of similar poor communication skill incidents." *Id.* at 28. The investigation report also suggested that the PIP was poorly structured, was not properly monitored, and was intended as punishment. *Id.* Personnel Investigation 18-005 sustained the accusation that Plaintiff had countermanded an instruction from Deputy Chief Tyler regarding the PT schedule for new recruits. *Id.* at 32, 45.

[16] Plaintiff attempts to dispute the asserted fact but generally fails to cite to any evidence in the record. Although not cited by Plaintiff, out of an abundance of caution, the Court reviewed Plaintiff's declaration, which does address the asserted fact. In her declaration, Plaintiff attests that Deputy Chief Wasem gave her permission to relinquish her post. Dkt. 38-1 at 3 ¶ 8. This does not directly contradict the asserted fact, as Defendant only contends that Norwood referred

9

15. Norwood signed a February 26, 2021 letter of reprimand to Plaintiff because he wanted her to be aware about the concerns regarding her conduct and willingness to adhere to the principles of command.  In the letter of reprimand, Norwood specifically advised, "I am hoping that you will see this an opportunity to reset your professional responsibilities and improve your performance.  Others could have charged you with insubordination . . . because you essentially relieved yourself of command and told others that you were doing that."  The letter also reflects a determination that Wasem did not authorize Plaintiff to leave her command.[17]

16. Kluh, who was also involved in the incident with Plaintiff on April 15, 2020, also received a letter of reprimand for his conduct.  The dispute arose when both Majors attempted to give a subordinate conflicting orders about tasks to prioritize.  Both Majors were cited for their childish behavior and for bringing discredit upon Defendant.  Kluh's letter did not warn about insubordination because he did not relinquish his command.[18]

_____

Plaintiff for discipline, but it provides additional context and, thus, the fact is so modified.  Plaintiff otherwise fails to dispute the asserted fact, and her reliance on the Hunton investigation report (Dkt. 39-17), which Plaintiff quotes but fails to appropriately cite, does not dispute the asserted fact that the investigation did not support Plaintiff's allegations.  Accordingly, as appropriately modified, there is no genuine dispute of material fact.

[17] As an initial matter, although Defendant does not cite directly to the letter, the letter is attached to the MSJ as docket entry 29-3.  Because the Court modified the previous fact to include Plaintiff's assertion that Wasem gave her permission to leave her command, the Court further modifies this asserted fact to reflect that the investigation found otherwise.

Plaintiff attempts to dispute the asserted fact by stating: "DENIED that Norwood wrote Reed a letter of reprimand to be aware that there were serious concerns  . . . .  Norwood knew that Huchler, Tyler, and Wasem were out to get Reed after she engaged in protected activity and used the letter to paper her file even after he was informed that Wasem gave her permission to relinquish her responsibilities . . . .  Namely the fabricated narrative that she had removed herself from her Major role which was not the case, as stated above she was still working in her office handling police business!!![sic]."  Plaintiff fails to cite any record evidence.  Plaintiff's declaration, which again she does not cite, only supports the assertion that Wasem gave her permission to leave, but the Court has already taken account of that attestation in the prior asserted fact. Moreover, Plaintiff does not point to any evidence on which she could rely to dispute Norwood's thought process. Accordingly, there is no genuine dispute of material fact.

[18] In their briefing, the parties never directly state what started the dispute between Plaintiff and Kluh in April 2020.  Between the February 26, 2021 letter and Plaintiff's Opposition and Declaration, the Court discerns that Plaintiff and Kluh were arguing about whose orders a subordinate was required to follow.  Accordingly, the asserted fact has been so modified.

Plaintiff attempts to dispute the asserted fact again without citation to any record evidence. Although Plaintiff's Opposition asserts that Kluh was harassing Plaintiff, her declaration does not

17. Plaintiff was also the subject of another IA investigation related to a death investigation along the Dulles Toll Road on February 17, 2021. This was the fourth IA investigation into Plaintiff's conduct in four years, which had resulted in four different departmental orders sustained against her. Norwood then discussed with Huchler and others what level of discipline to impose. They agreed that, although termination was warranted, they would instead demote Plaintiff one rank, to Lieutenant. A letter proposing demotion was issued on July 22, 2021, and, following receipt of her response, a decision to demote was issued on September 15, 2021.[19]

18. In addition to the three prior IA investigations and the policy violations relating to the February 2021 incident, the July 2021 letter proposing demotion also cited a host of performance problems, as documented by Tyler in a separate memorandum. The July 2021 letter concluded that Plaintiff's performance since her reassignment to command at Washington Dulles International Airport ("IAD") "illustrates a level of performance inconsistent with the role and responsibilities of the Major position."[20]

---

make the same assertion, but states that Kluh was failing to support her as a colleague. *Contrast* Dkt. 38 at 15 (stating that she complained about harassment regarding this incident), *with* Dkt. 38-1 ¶¶ 8-9 (asserting that Kluh was frustrating and that he was not supporting her as a colleague in the performance of her duty). Moreover, Plaintiff asserts that Kluh was not disciplined for insubordination, but Kluh directing a subordinate in contravention of a co-equal's direction is not insubordination because Plaintiff was not above Kluh in the hierarchical command. Dkt. 38 at 15. Accordingly, there is no genuine dispute of material fact.

[19] As an initial matter, Defendant cites exhibit 3 to support the asserted fact, but this appears to be a typographical error, because exhibit 3 is the February 26, 2021 letter. It appears that Defendant intended to cite Huchler's declaration, which addresses the facts asserted and which is attached as exhibit 4. *Contrast* Dkt. 29-3, *with* Dkt. 29-4. This appears to be a typographical error that is repeated throughout the brief. The Court assumes generally where Defendant references a particular paragraph of "Ex. 3" that Defendant intends to refer to Huchler's declaration in exhibit 4, because exhibit 3 does not have numbered paragraphs.

Plaintiff attempts to dispute the asserted fact but fails to cite to any record evidence. Rather, Plaintiff turns to argument and inappropriate commentary where she asserts: "It was a Kangaroo Court and it was no wonder that all the Ias against Reed were sustained by the 'good ole boys club.'" Dkt. 38 at 16. Although this allegation is unsupported, it is worth noting that the only Internal Affairs officer that Plaintiff has identified (although not in any record evidence) was Angie King – a woman. Dkt. 38 at 14 (referencing Angie King in Internal Affairs).

[20] Plaintiff attempts to dispute the asserted fact. In general, Plaintiff fails to cite any record evidence regarding the asserted fact. Plaintiff does, however, purport to reference two photographs of Deputy Chief Tyler "sleeping on the job." Dkt. 39-16. These photographs are provided without context and are not referenced in Plaintiff's declaration. Thus, the photographs are of limited

19. Plaintiff's demotion was intended to provide her with an environment where she would be in charge of a smaller command. The personnel assigned to this role have long worked in a modular building adjacent to the Dulles Police Station. Huchler hoped that this role would allow Plaintiff to rehabilitate herself and recommit herself to the essential principles of policing.[21]

20. Until very recently, there were four majors in Defendant's Police Department, two white males (Moore and Kluh), one black male (Freddie Crowder), and a black female (Sundi Harris). Crowder recently retired and has not yet been replaced. All of the selections for the position of Major were made through competitive procedures, beginning with a public vacancy announcement. All of the current four Majors were promoted from within the ranks. Although Kluh was hired in 1997 and Crowder in 2002, Plaintiff (who was hired in 2004) was promoted in advance of them.[22]

21. When Huchler was hired as Chief of Police, there were two IA reports awaiting his action involving Plaintiff. Huchler was surprised to find these two reports, because, in his experience, it is extremely unusual for there to be a single IA investigation regarding high level command staff. He was also surprised because the two investigations involved situations where Plaintiff was accused of failing to follow the chain of command regarding taking orders and direction from her supervisors.[23]

22. Prior to joining Defendant, Huchler had no knowledge of Plaintiff, Kluh, or Tyler or any of the other officers involved in the IA investigations. After reviewing the

---

relevance without any proffered explanation of the circumstances in which they were taken. Accordingly, Plaintiff has failed to demonstrate a genuine dispute of material fact.

[21] Plaintiff attempts to dispute the asserted fact but again cites no record evidence. The substance of her dispute is essentially an argument that the assignment was intended to humiliate her. Given the absence of any citation to record evidence, there is no genuine dispute of material fact.

[22] Plaintiff attempts to dispute the asserted fact but again cites no record evidence. In essence, Plaintiff argues that the asserted facts are not relevant. Plaintiff also denies that she was a "DEI hire who did not deserve her promotion." Dkt. 38 at 17. Defendant did not assert this; thus, there is nothing to dispute. Accordingly, there is no genuine dispute of material fact.

[23] Plaintiff attempts to dispute the asserted fact but again fails to cite any record evidence. Plaintiff's declaration does not even directly deny that she failed to follow chain of command requirements, instead simply alleging that her superiors' failure to include her in certain meetings also failed to follow chain of command. Dkt. 38-1 ¶ 13. Accordingly, there is no genuine dispute of material fact.

investigations, Huchler decided that he would only impose very modest discipline on Plaintiff – an oral reprimand on one and a letter of reprimand as to the other.[24]

23. The third incident which resulted in discipline of Plaintiff occurred on April 15, 2020.[25] Plaintiff and Kluh, who were in charge of different commands, had a dispute as to which of the officers that reported to them would be required to physically count the personal protective equipment ("PPE") on hand. Plaintiff and Kluh were unable to resolve the issue and went to their respective supervisors, Wasem and Tyler. The Deputy Chiefs communicated that Plaintiff and Kluh were expected to resolve the conflict. At some point, Plaintiff sent Wasem an email stating that Kluh, whose command station was more than 15 miles away, was creating a hostile work environment for her, that she was being discriminated against, and that she was being retaliated against. Plaintiff then sent an email to Huchler, Wasem, and Tyler informing them that she was removing herself from command.[26]

24. Harris conducted an IA investigation of Kluh's conduct in connection with the events on April 15 and April 16, 2020. Harris obtained written statements from eight officers and interviewed each of those officers.[27]

---

[24] Plaintiff attempts to dispute the asserted fact but again fails to cite any record evidence. Plaintiff asserts without citing to any evidence that Huchler knew Kluh because they had worked on Special Response Team incidents previously. Dkt. 38 at 17. Out of an abundance of caution, the Court also reviewed Plaintiff's declaration which does not refer to Huchler knowing Kluh. Thus, Plaintiff has failed to dispute Huchler's declaration that he did not know Plaintiff, Kluh, or Tyler previously, and there is no genuine dispute of material fact. Dkt. 29-4 at 4 ¶ 8.

[25] This incident has been discussed previously. Counsel are advised for future filings that it is appreciated when assertions of undisputed fact are set forth chronologically, because it is difficult for the Court to get a whole picture of the events relayed, where incidents are discussed in multiple places with different facts discussed each time.

[26] Plaintiff attempts to dispute the asserted fact but fails to cite to any record evidence. To the extent that Plaintiff asserts that she was given permission by Wasem to leave her post in reliance on her declaration (which she does not cite), Plaintiff does not dispute that an investigation determined that she left her post. Dkt. 29-7. Indeed, the investigation conducted by Hunton determined that, although Wasem offered Plaintiff to take off for two days from her command position, Plaintiff declined and then, subsequently, sent an email stating, "I am removing myself from the POC operations as the Incident Commander." *Id.* at 28; Dkt. 38-1 ("I took him up on that offer and let him know same via email on April 16th"). Accordingly, there is no genuine dispute of material fact.

[27] As an initial matter, Defendant refers to Harris's declaration being provided at Exhibit 4, but, as previously noted, Exhibit 4 is Huchler's declaration. This appears to be a typographical error. The Court assumes that when Defendant cites to Exhibit 4, it intended to cite to Exhibit 5. Dkt. 29-5.

25. Harris concluded that Plaintiff and Kluh had a history of personality conflict, which was well known inside the Police Department.  Harris concluded that Plaintiff believed that Kluh disrespected her and baited her into conflicts, whereas Kluh felt that Plaintiff tried to intimidate him, dating back to when he was her subordinate.[28]

26. Harris's investigation of the April 2020 incident regarding the PPE found that Plaintiff refused to continue to speak with Kluh due to her contention that Kluh was creating a hostile work environment.  Harris found that, thereafter, Plaintiff removed herself as the commander, even though she did not have permission from the Chief or his designee to do so.  Harris concluded that by doing so Plaintiff violated General Order 1-400.23, Attention to Duty.[29]

---

Plaintiff attempts to dispute the asserted fact but fails to cite to any record evidence.  Instead, Plaintiff cites back to her response to Defendant's statement of undisputed fact in paragraph 9, which appears to have no relevance here.  Nor does Plaintiff explain why that assertion is relevant.  *Contrast* Dkt. 29 ¶ 25 (discussing Harris's investigation), *with* Dkt. 38 at 12 ¶ 9 (discussing Plaintiff's qualifications for promotion to Major).  Accordingly, there is no genuine dispute of material fact.

[28] Harris's findings are included in the record as one of the attachments to Huchler's declaration, though not cited by Defendant.  Dkt. 29-4 at 46-61.

Plaintiff attempts to dispute the asserted fact but fails to cite to any record evidence.  In any event, Plaintiff cannot dispute that Harris reached these conclusions.  Dkt. 29-4 at 46-61.  Plaintiff asserts that "Harris' investigation was tainted with bias because it was overseen by Huchler who had already found Reed guilty" and provides an indication to "CITE to NR affidavit."  Dkt. 38 at 18.  Plaintiff does not cite to her own declaration, but, even so, a review of that declaration is not supportive of her attempted dispute because the declaration does not mention Harris.  Dkt. 38-1.  To the extent that Plaintiff attempts to rely on the other declarations that she provides, she did not cite them and only Deborah Lockhart's declaration mentions Kluh being biased against people of color.  Dkt. 38-2.  Lockhart's attestations in this regard are wholly conclusory and provide no specifics regarding the basis for her perception.  *Id.* ¶ 3; *see Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 134–35 (4th Cir. 2001) ("Bryant also contends that the affidavit testimony of three individuals . . . demonstrates that he was discriminated against because of his race. These affidavits, however, amount to no more than subjective beliefs, and such evidence, without more, is insufficient to create a genuine issue of material fact as to any discriminatory conduct . . . ").  Accordingly, there is no genuine dispute of material fact.

[29] Plaintiff attempts to dispute the asserted fact but cites to no record evidence, merely incorporating her responses to other asserted facts which only cited Hunton's investigation report.  And, Plaintiff cannot dispute that Harris reached this conclusion, which is all that is asserted by Defendant.  In any event, Hunton's report, like Harris's report, concluded that Plaintiff removed herself from duty without permission because she had rejected Wasem's prior offer of relief.  Dkt. 29-4 at 56-57 (finding "Deputy Chief Wasem asked her if she wanted to take the next two days off and she declined" but that, one day later, "Plaintiff sent another email [to] the Deputy Chiefs and

27. After consulting with Human Resources, Heppen, and Norwood, it was determined that Plaintiff's complaints should be referred to outside counsel for investigation. Defendant retained Hunton to conduct an investigation. Hunton also concluded that there was a personality clash between Plaintiff and Kluh but did not find that it amounted to a hostile work environment.[30]

    a. The investigation was conducted by two senior Hunton attorneys: Sharon Goodwyn (black female) and Sona Rewari (South Asian female).[31]

    b. The Hunton attorneys selected the personnel to interview and the documents to review. Defendant placed no constraints on Hunton in terms of their conduct or the investigation.[32]

---

the Chief of Police informing them that she was removing herself as the Police Operation Center's incident commander"); Dkt. 29-7 at 27-28 (finding "Deputy Chief Wasem offered Maj. Reed the opportunity to take off April 16th and April 17th," but "[s]he declined his offer" and then, on April 16, 2020, "sent an email to Deputy Chiefs Wasem and Tyler and Chief Huchler," stating, "I am removing myself from the POC operations as the Incident Commander"). Moreover, there is no dispute between Harris's report and Plaintiff's declaration. Both acknowledge that Wasem offered to let Plaintiff take the next two days off, and Plaintiff does not address the assertion that she declined that offer before determining, on her own, to relieve herself of command. Furthermore, Plaintiff's declaration acknowledges that she relinquished her command duties but maintains that she did not leave the office because she was "still performing my other major duties." Dkt. 38-1 ¶ 8. Accordingly, there is no genuine dispute of material fact.

[30] Plaintiff attempts to dispute the asserted fact but does not cite to any portion of the record. Indeed, Plaintiff only incorporates her response to a different asserted fact. Plaintiff cannot dispute that Hunton determined that her claims were not supported. *See* Dkt. 29-7 at 7-41. Plaintiff notes that Hunton found that some people perceived IA investigators as friends with Kluh. *Id.* at 40. But it is unclear what relevance that has here, and, in any event, Hunton concluded that this was because "IA is headed by a lieutenant who has worked in a wide variety of positions with the department over many years" and that "this perception of a pre-existing friendship or allegiance between IA and the subject of its investigation is not unique to Maj. Kluh." *Id.* Accordingly, there is no genuine dispute of material fact.

[31] In asserted undisputed facts 36 through 38, Defendant largely repeats information regarding the Hunton investigation. The Court only addresses the new information asserted by Defendant. Again, there is a typographical error with respect to Heppen's declaration, which is referred to as Exhibit 6, but actually appears at Exhibit 7 (Dkt. 29-7). Although Plaintiff disputes some of the repeated information not included here, with respect to this specific information Plaintiff only asserts that it "is offensive that Defendant references [t]he race and sex of the Hunton investigators." Dkt. 38 at 20. There is no genuine dispute of material fact in this regard.

[32] Plaintiff attempts to dispute the asserted fact, by noting, "Reed provided names of witnesses for the Hunton investigators to review." Dkt. 38 at 20. Once again this is unsupported

c. Hunton found that Plaintiff had a history of conflict with her superiors and subordinates in the Department (male and female, black and white). Hunton also determined that Plaintiff was not retaliated against because the decisions of which she complained were based on legitimate, non-retaliatory reasons.[33]

28. After the report from Hunton was received, Defendant determined that it needed to impose discipline relating to the April 2020 incident. Defendant decided to impose the same type of discipline, a letter of reprimand, on both Plaintiff and Kluh. Defendant viewed Plaintiff's situation as more concerning, however, because it was her third sustained IA investigation since becoming a Major and involved her essentially walking off the job.[34]

29. After the February 2021 incident on the Dulles Toll Road[35] and the issuance of the letter of reprimand, Huchler determined that the modest progressive discipline previously meted out was not achieving its desired goal of changing Plaintiff's behavior. Huchler perceived that Plaintiff did not get along with her supervisors

---

by any citation to the record. But, in any event, it does not dispute the asserted fact. Accordingly, there is no genuine dispute of material fact.

[33] Plaintiff attempts to dispute the asserted fact but again fails to cite to any portion of the record. To the extent that Plaintiff again relies on some witnesses' perceptions that black employees were disciplined more harshly, such vague and conclusory statements made by anonymized individuals cannot create a genuine issue of material fact, as without details it is impossible to assess whether such perceptions were reasonable. Accordingly, there is no genuine issue of material fact.

[34] Plaintiff attempts to dispute the asserted fact but again does not cite to any portion of the record. Plaintiff also incorporates her response to a different asserted fact. As noted previously, there is no dispute between Plaintiff's declaration and the findings of the Harris and Hunton investigations because both agree that Wasem did offer Plaintiff to take time off, but the Harris and Hunton investigations determined that Plaintiff declined that offer (which Plaintiff's declaration does not dispute or address) and then later removed herself from the command position (which again Plaintiff's declaration does not dispute or address). Accordingly, there is no genuine dispute of material fact.

[35] Defendant does not assert in its undisputed facts the circumstances of this incident (which again it previously mentioned out of chronological order). According to Harris's investigation, on February 17, 2021, a body was discovered on the Dulles Toll Road. Dkt. 29-4 at 64. Fairfax County Police were on the scene, and it was determined that they would lead the investigation into the possible homicide. *Id.* Plaintiff then arrived on scene and issued directives to a lieutenant and, when informed that her directives could taint Fairfax County Police's investigation, she raised her voice. *Id.* Plaintiff then accused the lieutenant of being insubordinate and, when Deputy Chief Tyler arrived on scene, was told not to pursue it further. *Id.* Plaintiff then said, "Don't do that to me Deputy Chief." *Id.*

16

(Norwood, Wasem, or Tyler), her colleagues (Kluh or Moore), or her subordinates (Lieutenants Beldon and Blayman and Seargeant Brown). Huchler therefore determined that Plaintiff continuing in the role of Major was having an adverse effect on the Department.[36]

30. When Tyler was hired, Plaintiff had already been promoted from Lieutenant to Major. He observed that, although Plaintiff had strong administrative skills, she struggled with leading people and in leading police operations. He further observed that she lacked practical knowledge of policing which undermined her effectiveness.[37]

31. Plaintiff again came under Tyler's command in August of 2020 when she was reassigned from the Support Bureau to the IAD Station Command. Tyler noted numerous performance deficiencies while she reported to him, particularly regarding successful completion of assignments. Tyler had assigned Kluh to prepare a transition memo for Plaintiff, which was sent to her a week or two before her transition, and, when she met with Tyler to discuss the transition, Tyler

---

[36] Plaintiff attempts to dispute the asserted fact but again fails to cite to any portion of the record on summary judgment. To the extent that Plaintiff alleges that Brown was pushed to make a complaint against her, this too is unsupported by the record as Plaintiff submitted no declaration or affidavit from Brown and Brown is only tangentially referenced in Plaintiff's declaration. Dkt. 38-1 ¶ 10 (noting that Hunton staff told Plaintiff that they were also investigating allegations against Plaintiff by Brown). Accordingly, there is no genuine dispute of material fact.

[37] As an initial matter, Defendant refers to Tyler's declaration being provided at Exhibit 5, but, as previously noted, Exhibit 5 is Harris's declaration. This appears to be a typographical error. The Court assumes that when Defendant cites to Exhibit 5, it intended to cite to Exhibit 6. Dkt. 29-6.

Plaintiff attempts to dispute the asserted fact by citing to her 360 Review. Dkt. 39-10. But the 360 Review supports that Tyler felt that Plaintiff struggled with leadership at the time as attested to in his declaration. *See id.* at 4 (response from Tyler indicates "Major Reed has little understanding of trends within the law enforcement profession"). Plaintiff does not direct the Court to any particular portion of the 360 Review. Additionally, the 360 Review appears to have been conducted in 2018, well before the conduct being discussed here. *Id.* at 4 (noting response dates in November 2018). And, to the extent that Plaintiff contends that Tyler was biased against her, Plaintiff fails to cite to any record evidence, but the Court assumes that Plaintiff intended to cite to her own declaration which is vague and conclusory. Dkt. 38-1 ¶ 5 ("The only person who did not make positive comments about me was Deputy Chief Tyler, the same man who initiated the several tainted with bias Internal Affairs Investigations against me and fished for complaints against me with my admin assist after I complained of race discrimination, hostile work environment, and retaliation."); *see Evans*, 80 F.3d at 962 (conclusory affidavits insufficient to defeat summary judgment); *Bryant*, 288 F.3d at 134–35 (same). Accordingly, there is no genuine dispute of material fact.

perceived that she had not read the memo (nor did she bring a copy to the meeting).[38]

32. During the February 2021 Dulles Toll Road incident, Tyler was aware of a vocal disagreement between Plaintiff and then-Lieutenant Beldon.  Tyler observed the exchange grow heated and was forced to tell Plaintiff, "not here, not now," because he did not want a public scene while they were assisting the Fairfax County Police.  Because Beldon and Plaintiff disagreed on the facts and whether Beldon was insubordinate or whether Plaintiff acted inappropriately, Tyler was required to refer the incident to IA for investigation.[39]

33. On May 24, 2021, Tyler sent a memo to Huchler detailing his concerns regarding Plaintiff's performance and providing examples.  The memo included extensive discussion regarding Plaintiff's failure to prepare staffing assignments regarding the 59th Presidential Inauguration and inability to assist in the preparation of an operational plan for the event.  It also discussed Plaintiff's failure to prepare for a meeting with Huchler regarding new beat designations, because she appeared to be unfamiliar with the new beat maps.  Tyler's memo also recounted comments from lieutenants who complained that Plaintiff did not talk with them, including from King and Lieutenant Grewe (white male) who complained that they never received operational direction from Plaintiff.[40]

34. Heppen consulted with personnel regarding Plaintiff's conduct on many occasions, including regarding the decision to demote Plaintiff.  Although Heppen agreed that termination was appropriate, Heppen also agreed that it was appropriate to exercise clemency and to demote Plaintiff, rather than terminate her.

35. Defendant has policies barring discrimination, retaliation, and the creation of a hostile work environment.  These policies are contained in various Directives, such

---

[38] Plaintiff attempts to dispute the asserted fact but again fails to cite to any record evidence.  A review of Plaintiff's declaration does not reveal any further information that would contradict Defendant's asserted fact.  Accordingly, there is no genuine dispute of material fact.

[39] Plaintiff attempts to dispute the asserted fact but again fails to cite to any record evidence.  Plaintiff asserts that Tyler witnessed Beldon be insubordinate to her.  Although she does not cite to her declaration, this is supported by her declaration.  Dkt. 38-1 ¶ 11.  Furthermore, to the extent that Plaintiff asserts, without citation, that Tyler was required to refer Plaintiff to IA, this is also supported by Tyler's declaration.  Dkt. 29-6 ¶ 5.  Accordingly, the asserted fact is modified to reflect that, because Beldon and Plaintiff could not agree on certain facts, the matter was required to be referred to IA for further investigation.  With that modification, there is no genuine dispute of asserted fact.

[40] Plaintiff attempts to dispute the asserted fact but again fails to cite to any record evidence.  Plaintiff instead attempts to incorporate her responses to other asserted facts, but it is unclear how they dispute the asserted facts here.  Accordingly, there is no genuine dispute of material fact.

as the Equal Employment Opportunity and the Workplace Violence Directives. These policies are enforced pursuant to the Conduct and Discipline Directive which establishes penalty guidelines for offenses.    Heppen is not aware of any administrative or judicial finding that Defendant has discriminated against or retaliated against any of its employees.[41, 42]

## IV.  LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The party seeking summary judgment has the initial burden to show the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party.  *Anderson*, 477 U.S. at 255.  "(A) party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact."

---

[41] Plaintiff attempts to dispute the asserted facts but again fails to cite any record evidence. Dkt. 38 at 21 (noting an intention to "CITE black female affidavits" but not citing any such affidavit).  Plaintiff asserts that Kluh, Wasem, Tyler, and Huchler disregarded the referenced policies.  Although the declarations submitted by Lockhart, Tonya Gravely, and LaQuisha Dooms do reference allegations of race discrimination, they are all conclusory and lack details such that they cannot create a genuine dispute of material fact.  *See* Dkt. 38-2 ¶ 3 (alleging generally that, instead of disciplining officers for discrimination, management "tucked them away" and not providing any details); Dkt. 38-4 ¶¶ 3-6 (alleging discrimination but failing to provide any specifics and asserting that management "tuck[ed] him away"); Dkt. 39-4 ¶¶ 3-5, 9 (alleging discrimination against black, female officers, but not providing any specific details, and alleging that Kluh was "tucked away"); *see Evans*, 80 F.3d at 962 (conclusory affidavits insufficient to defeat summary judgment); *Bryant*, 288 F.3d at 134–35 (same).  To the extent that Plaintiff faults Heppen's declaration for only asserting that there were *no findings* of discrimination rather than *no allegations* of discrimination, this does not dispute that asserted fact and is argument.  Accordingly, there is no genuine dispute of material fact.

[42] Defendant asserts a final fact regarding the fact that Harris does not believe that there is systemic racism or sexism in the Department. Dkt. 29-5 ¶ 6.  Like the declarations relied upon by Plaintiff, Harris's declaration is similarly vague and conclusory and cannot be relied upon to support or dispute any material fact on summary judgment.

*Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

## V.  ANALYSIS

In the operative complaint, Plaintiff asserted the following claims: (i) race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1983; and (ii) retaliation in violation of Title VII and Section 1983.  Dkt. 12.  Defendant argues that Plaintiff: (i) cannot establish a *prima facie* case of discrimination; (ii) cannot establish pretext; (iii) cannot establish a Section 1983 claim; (iv) cannot establish a *prima facie* case of retaliation; and (v) cannot establish a Section 1983 claim.  The Court will first address the Title VII claims and then address the Section 1983 claims.

### A.        Title VII Discrimination

Where, as here, a plaintiff does not rely on direct evidence of discrimination, she needs to demonstrate a *prima facie* case of discrimination: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."  *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)), *aff'd sub nom. Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30 (2012).  If Plaintiff establishes a *prima facie* case of discrimination, then Defendant has an obligation to produce a legitimate, non-discriminatory reason for its actions and, if so, the burden shifts back to Plaintiff to establish pretext.  *See Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021). An employer's burden is only to "articulate" a legitimate, nondiscriminatory reason and is a burden of production.  *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).  Here, Defendant argues both that Plaintiff fails to establish a *prima facie* case of discrimination and that

Plaintiff fails to establish pretext. The Court will address each argument in turn; however, the Court must first address Plaintiff's claim of a constructive discharge.

i.    *Adverse Employment Actions*

Plaintiff asserts five adverse employment actions in her Amended Complaint: (i) disparate discipline; (ii) punitive Internal Affairs Investigations; (iii) solicitation of false complaints about her; (iv) lower performance reviews; and (v) constructive discharge. The constructive discharge is the only adverse employment action that Plaintiff discusses in her Opposition with respect to her discrimination case, thus the Court will focus its analysis there.

A plaintiff may establish a constructive discharge by showing that her employer "deliberately made his working conditions intolerable in an effort to induce him to quit." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006). But, as the Fourth Circuit has noted, "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* In assessing whether a work environment is intolerable, the Fourth Circuit has instructed that a reviewing court must assess "whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,' . . . that is, whether [s]he would have had *no choice* but to resign." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) (emphasis in original). The question with respect to a constructive discharge claim is whether a plaintiff's circumstances were "intolerable." *EEOC v. Consol. Energy, Inc.*, 860 F.3d 131, 144-45 (4th Cir. 2017). As judges within this District have recognized, "constructive discharge claims are held to a high standard, and even truly awful working conditions may not rise to the level of constructive discharge." *Lindsay-Felton v. FQSR, LLC*, 352 F. Supp. 3d 597, 606 (E.D. Va. 2018).

21

In support of intolerability, Plaintiff argues: "Daily humiliation by your superiors and them making jokes about you and talking down to you fits the bill for constructive discharge." Dkt. 38 at 24 (not citing anything). This is only true where the basis for the joke or humiliation is a protected characteristic. In any event, Plaintiff has not established that she was subjected to daily humiliation. Indeed, Plaintiff's declaration does not allege, even in conclusory fashion, that she was subjected to daily humiliation. Dkt. 38-1. The closest that Plaintiff comes to such an assertion is that she was "regularly exclude[ed]" from an unspecified number of meetings and other communications. *Id.* ¶ 13. Plaintiff does not describe this as humiliating. *Id.* Furthermore, the Fourth Circuit and this Court have held that exclusion from meetings do not even meet the lower bar set for a hostile work environment claim. *See Gallo v. US Investigations Servs., Pro. Servs. Div., Inc.*, 2007 WL 4622917, at *4 (4th Cir. Dec. 28, 2007) (affirming grant of summary judgment where hostile work environment claim based on exclusion from meetings and emails); *McCarty v. City of Alexandria*, 2025 WL 1899987, at *4 (E.D. Va. July 9, 2025) (dismissing hostile work environment claim premised on alleged failure to communicate or interact). To the extent that Plaintiff attempts to premise her constructive discharge claim on any joke, her declaration only identifies a bet that Huchler had with Kluh about Plaintiff not knowing certain information. Dkt. 38-1. It is not clear how this was related to her race or sex, as the clear inference is that it was based on her job performance. Dkt. 29-6 (describing Plaintiff's lack of preparedness).

Notably, all of the incidents that Plaintiff describes in her declaration took place well before September 2021 when her employment with defendant ended. Even taking into account Plaintiff's own timeline, which is unsworn and thus is not properly considered on summary judgment, the only allegation regarding events in September 2021 is that the demotion – which had been proposed months earlier – became effective. Dkt. 39-19. Although demotion can constitute a

22

constructive discharge in some cases, Plaintiff has not put forward any facts that would make it so here.  Indeed, Plaintiff has put forward no facts about the effect of her demotion.  *See Carter v. Ball*, 33 F.3d 450, 459-60 (4th Cir. 1994) (holding that demotion "can constitute a constructive discharge, especially where the demotion is essentially career-ending action or a harbinger of dismissal" and citing with approval *Jurgens v. EEOC*, 903 F.2d 386 (5th Cir. 1990), where the Fifth Circuit held that demotion from GS-15 to GS-14 was not a constructive discharge).  Here, Plaintiff has put forward no facts regarding the impact of her demotion from Major to Lieutenant on her pay, supervisory responsibilities, or anything else.  In the absence of such evidence in the record, no reasonable juror could determine that Plaintiff was constructively discharged in these circumstances.  Moreover, as discussed further *infra*, Plaintiff was not performing her job adequately, fails to connect her demotion to her race or sex, and fails to establish pretext.

With respect to the remaining adverse employment actions, only the allegations of discipline imposed and the internal affairs investigations are supported by the record.  *See Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 350 (2024) (holding that a Title VII Plaintiff need only show "some harm" to establish an adverse employment action).  Plaintiff's allegations of lower performance evaluations are unsupported by the record.  Indeed, it is entirely unclear what Plaintiff means by "performance evaluation."  To the extent that she intends to refer to documents proposing discipline which also refer to performance issues, the Court considers those as part of her disciplinary argument.  To the extent that Plaintiff intends to refer to the 360 Review, that is time-barred because it is beyond the 300-day lookback.  *Contrast* Dkt. 12 ¶ 14 (EEOC charge filed on July 17, 2020), *with* Dkt. 39-10 at 4 (360 Review performed in November 2018); 42 U.S.C. § 2000e-5(e) (setting forth 300-day lookback).  Plaintiff's assertion that Defendant solicited false complaints about her is also unsupported by the record.  In her declaration, Plaintiff asserts that

23

Tyler "fished for complaints against me with my admin assist after I complained of race discrimination." Dkt. 38-1. In the first instance, fishing for complaints that come to naught (and Plaintiff does not attest that anything further happened) does not alter the terms and conditions of Plaintiff's employment and does not qualify as an adverse employment action. In the second instance, Plaintiff's declaration does not support that Tyler solicited *false* complaints. And, finally, Plaintiff's attestation in her declaration is vague and conclusory such that it cannot support her claim at summary judgment. Thus, the Court only considers the following as adverse actions in the rest of its analysis: (i) the discipline imposed; (ii) the IA investigations; and (iii) the demotion.

ii.    *Job Performance*

The Court next considers whether Plaintiff was adequately performing her job. No reasonable juror could find that she was doing so. Plaintiff does not point to any evidence in the record that she was performing her job well, outside of her own declaration. Dkt. 38-1. But, when assessing job performance, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996). In any event, all of the metrics that Plaintiff points to in favor of her performing her job well are years before the relevant time period for her claims here. Dkt. 38-1 (referencing selection to FBI Academy in 2016); Dkt. 39-10 at 4 (360 Review performed in November 2018, which only demonstrated positive assessment by peers). Likewise, the perception of Plaintiff's colleagues as to whether she was performing her job well is irrelevant. *See Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 444 (4th Cir. 1998) ("It is the perception of the decision maker which is relevant to the question of [job performance], not the opinions of [plaintiff's] coworkers or other third parties."). Thus, Plaintiff has not established that she was performing her job well during the relevant period in 2020 and 2021.

On the other hand, Defendant has introduced evidence – which Plaintiff has failed to dispute – that Plaintiff was the subject of four IA investigations. Two of those investigations began under Norwood – who she does not identify as discriminating or retaliating against her. Dkt. 38 at 11 (naming Kluh, Tyler, Wasem, and Huchler as the alleged discriminators). And, in each case, the accusations against her were sustained by persons not alleged to have discriminated against her. Dkt. 29-4 (PI 17-029(A) was investigated by Harris who is a black female, PI 18-005 was investigated by a Dannie D. Snyder who is not otherwise identified in the parties' briefs, PI 20-014 was investigated by Harris, PI 21-003 was investigated by Harris). Moreover, Plaintiff does not dispute the PI 17-029(A) investigation and expressly states: "I was found guilty of an internal affairs investigation because I did not properly oversee the Performance Improvement Plan process . . . ." Dkt. 38-1 ¶ 15. Plaintiff also concedes that she could not resolve the April 2020 dispute over whose staff would be in charge of inventorying the PPE supply, which was the subject of PI 20-014. *Id.* ¶ 8 (discussing that Kluh had "frustrated" her abilities and so she had to remove herself from the situation). Even taking as true Plaintiff's assertion that she had permission to leave her command (although Plaintiff fails to address that she declined that offer), Plaintiff does not challenge the other findings of the investigation related to her dispute with Kluh. Thus, the only IA investigation that Plaintiff truly asserts was improperly instituted was the fourth investigation related to the Dulles Toll Road incident. But even discounting that incident, Plaintiff was the subject of three IA investigations which were sustained against her.

Moreover, Norwood also noted performance problems related to Plaintiff. Dkt. 29-2 at 3 ¶ 7 ("I observed a lack of knowledge of policing on Reed's part which undermined her respect and credibility within the Department."); *id.* at 4-5 ¶ 11 (indicating that he signed the February 26, 2021 letter of reprimand because he wanted Plaintiff to know about his concerns). Plaintiff does

not allege that Norwood was biased against her; indeed, Norwood was the one who promoted her to Major. Rather, Plaintiff makes accusations to impugn the credibility of Norwood's affidavit; but, of course, the Court cannot consider credibility at summary judgment. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015) (recognizing that, in the summary judgment context, the court "cannot weigh the evidence or make credibility determinations").

In sum, a review of the record on summary judgment demonstrates that no reasonable juror could find that Plaintiff was meeting her employer's legitimate expectations and performing her job adequately during the relevant time period.

### iii. *Similarly Situated Comparators/Inference of Discrimination*

With respect to the fourth prong, Plaintiff has failed to demonstrate that similarly situated individuals were treated differently than she was or that her position was filled with an applicant outside of the protected class. To the extent that Plaintiff asserts that her position was filled with an applicant outside of her protected class, the Court notes that she did not allege this in her Amended Complaint. *Contrast* Dkt. 38 at 28-29 (alleging that Crowder was hired as Plaintiff's replacement), *with* Dkt. 12 (not alleging who replaced Plaintiff in her position). Plaintiff contends that "Crowder, was hired as Reed's replacement in 2021" and that subsequently there was "a white man (name unknown) who was hired as a major after Crowder." Dkt. 38. But this argument is unsupported by any citation to the record and, accordingly, cannot be relied upon to defeat a motion for summary judgment. Importantly, the record evidence is that: "*At present*, there are four Majors in the Department, two White men, Majors Moore and Kluh; a Black male, Freddie Crowder ('Crowder'); and a Black female, Sundi Harris ('Harris')." Dkt. 29-4 at 2 ¶ 4. The record does not indicate when Crowder and Harris were promoted to Major (Kluh and Moore were already Majors at the time of Plaintiff's resignation). Thus, Plaintiff has failed to establish that she was

replaced by Crowder rather than Harris and therefore cannot demonstrate that she was replaced by someone outside of her protected class. Moreover, Plaintiff cannot, at summary judgment, rely on the alleged hiring of an unnamed white man as a major on only her counsel's say so; but, even if she could, the unnamed white man would not have been her replacement because Plaintiff asserts (again without citation) that he was hired to replace Crowder. Dkt. 38 at 29.[43] Thus, no reasonable juror could find, on this summary judgment record, that Plaintiff was replaced by an individual outside of her protected class.

With respect to whether similarly situated persons were treated differently, Plaintiff must establish that the alleged comparator is "similarly situated in all material respects." *Tinsley v. City of Charlotte*, 854 F. App'x 495, 500 (4th Cir. 2021). A plaintiff can demonstrate that he is similarly situated with a comparator by showing that they both (1) "dealt with the same supervisor," and (2) were "subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223-24 (4th Cir. 2019). However, a comparator's conduct need not be identical to the plaintiff's conduct, or involve "precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Id.* at 223. Nevertheless, the misconduct of the proposed comparator must be similar enough to that committed by the plaintiff to ensure that courts do not "confus[e] apples with oranges. . . . In other words, apples should be compared to apples." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (internal citations and quotations omitted).

---

[43] Even if – as Plaintiff contends – Crowder was promoted to replace Plaintiff, then Plaintiff would only create an inference of discrimination as to her sex discrimination claim as Crowder is also black.

27

Plaintiff first points to Kluh and asserts that he and Plaintiff were treated differently for the same incident. Dkt. 38 at 26. Not so. The discipline actually imposed was the same: they both received letters of reprimand. Dkt. 29-4 ¶ 12 ("We decided to impose the same type of discipline, a letter of reprimand, upon both Major Reed and Major Kluh."). Thus, they were treated similarly in the respect that they were similar. Plaintiff notes that the contents of the letter of reprimand that she received was different, in that it referenced that it could have involved a charge of insubordination. But Plaintiff cites to no caselaw stating that the contents of the letter of reprimand constitutes a material difference as to their treatment. Moreover, to the extent that it does constitute such a material difference, that difference is warranted by the different disciplinary histories between the two and that Plaintiff left her post. *See* Dkt. 29-4 ¶ 12 (referencing that this Plaintiff's third sustained IA investigation and that she left her post); *id*. 29-4 at 46-61 (Harris investigation of the incident recounting her findings regarding Plaintiff leaving her post). To the extent Plaintiff relies on other incidents, they are conclusory or not supported by the record on summary judgment. *See, e.g.*, Dkt. 38-1 ¶ 15 (Plaintiff alleges Kluh was not sent to IA for failing to properly manage his personnel, but fails to identify any incident during which Kluh failed to manage his personnel); *id.* ¶ 16 (Plaintiff alleges that she was the only Major put on 360 Review when someone filed a complaint against her but fails to identify any time when Kluh or Moore was subjected to a subordinate's complaint).[44] Plaintiff also asserts that "Majors Kluh and Moore were the majors over DCA when two M4s were missing from the DCA police station yet they were never punished for their involvement." Dkt. 38-1 ¶ 17. But, as Plaintiff conceded in her deposition, she did not know the results of that investigation and whether Moore and Kluh were responsible. Dkt. 29-1 at 162:4-7 ("Q. Well, how do you know what the result of the investigation was? A. I just said I

---

[44] As discussed *supra*, complaints relating to the 360 Review are time-barred.

did not know in terms of everything that they did . . . ."); *see Spriggs*, 242 F.3d at 185 n.7 (noting the "long-standing principle that a party against whom summary judgment is sought cannot create a jury issue by identifying discrepancies in his own account of the facts"). And, as Plaintiff's deposition response concedes, she lacks personal knowledge regarding that incident. *See* Fed. R. Civ. P. 56(c)(4) (requiring affidavits and declarations submitted to be based on personal knowledge and "show that the affiant or declarant is competent to testify on the matters stated").[45] Nor has Plaintiff pointed to any admissible evidence from which the Court could determine that Majors Kluh or Moore were similarly situated to Plaintiff in this regard or that they committed any kind of violation. Plaintiff points to no other examples of incidents where she asserts that similarly situated individuals were treated differently to her and, on this record, no reasonable juror could determine that there is an inference of discrimination to be drawn.[46, 47]

*     *     *

In short, Plaintiff has failed to demonstrate a *prima facie* case of race or sex discrimination.[48] Accordingly, the MSJ with respect to the Title VII claim in Count 1 could be granted on this basis alone. Nonetheless, the Court will also address whether Defendant has

---

[45] Defendant's responses to requests for admissions reveal that "neither Major Kluh nor Major Moore were disciplined as a result of the missing rifles because their conduct was not in question as to the missing rifles nor had they violated any General orders in connection with this matter." Dkt. 39-9 at 5.

[46] To the extent that Plaintiff attempts to create an inference of discrimination based on any of her or her witnesses' assertions of racism or sexism, the Court notes again that these allegations are entirely conclusory and cannot meet Plaintiff's burden on summary judgment to demonstrate an inference of discrimination sufficient to carry her *prima facie* burden.

[47] The Court notes that Plaintiff does not raise any other arguments to suggest that similarly situated comparators were treated differently with respect to the Dulles Toll Road incident or PI 18-005.

[48] Of note, Plaintiff never attempts to separate her claims of sex discrimination from her claims of race discrimination. Thus, the Court, like the parties, addresses them together.

proffered a legitimate, non-discriminatory reason ("LNR") for its actions and whether such explanation is pretextual.

### iv.    *LNR/Pretext*

Here, Defendant has put forward evidence that Plaintiff had been determined to have violated multiple policies and that her supervisors had concerns regarding her performance. *See* Dkt. 29-2 ¶¶ 4, 6-7, 9-11, 13-14 (Norwood affidavit); Dkt. 29-3 (letter of reprimand); Dkt. 29-4 at ¶¶ 5-6, 8-14 and attached Exhibits A-E (Huchler affidavit and IA investigation reports); Dkt. 29-6 at ¶¶ 3-11 (Tyler affidavit); Dkt. 29-7 at ¶ 10 and attached Exhibit A (Heppen affidavit and Hunton investigation report). This satisfies Defendant's burden to "articulate" a legitimate, nondiscriminatory reason, which is only a burden of production. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).[49]

The burden then shifts to Plaintiff to demonstrate that Defendant's justification is "unworthy of credence" or that there is other circumstantial evidence sufficiently probative of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 147 (2000). As the Fourth Circuit has instructed, "the core of every Title VII case remains the same, necessitating resolution of the ultimate question of discrimination." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (internal citations and quotations omitted). Here, Plaintiff has ultimately failed to present any evidence suggesting that her race or sex was the basis for any adverse employment action of which she complains.

It is unclear from Plaintiff's Opposition on what grounds Plaintiff bases her pretext argument. It appears that Plaintiff relies primarily on her *prima facie* case. Indeed, the word

---

[49] This articulation satisfies the burden of production with respect to each possible identified adverse employment action: the IA investigations, the discipline, and the demotion/constructive discharge.

"pretext" appears only two times in Plaintiff's Opposition. Dkt. 38 at 25 (concluding "Reed has established that MWWA's so-called legitimate reason for discipling [sic] or demoting her was pretext for unlawful discrimination. (Shifting reasons for termination?? [sic])"); *id.* at 29 (asserting in conclusory fashion that there are genuine issues of material fact "whether her demotion was pretextual"). Plaintiff has proffered no evidence that any of the decisions of which she complains were based on her race and/or sex. Accordingly, the MSJ will be granted in this regard.

Plaintiff identifies facts that are unsupported by the record, persons that are unnamed, and events that are not put into context as supporting her arguments. But it was Plaintiff's burden to investigate those circumstances and provide evidence to the Court; Plaintiff has not done so here and, at the summary judgment stage, "unsupported speculation is not sufficient." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006) (affirming grant of summary judgment where plaintiff offered only "naked speculation and open-ended rhetorical questions"). Moreover, as the Fourth Circuit has emphasized, the pretext inquiry is essentially merged with the "ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Stokes v. Va. Dep't of Corr.*, 512 F. App'x 281, 282 (4th Cir. 2013). Plaintiff offers no explanation for why she thinks that Kluh's interactions with her were based on race or sex, for why she thinks Tyler's interactions with her were based on race or sex, for why she thinks Wasem's interactions with her were based on race or sex, or for why Huchler's interactions with her were based on sex. Importantly, again it is worth noting that Plaintiff never distinguishes between her claims of race discrimination or sex discrimination and she must carry her burden with respect to pretext as to each protected class.

The declarations from other witnesses upon which Plaintiff relies, although they are suggestive of a troubling environment, are conclusory and do not speak to any of adverse actions

31

*at issue here.* Plaintiff's own declaration is similarly conclusory. Dkt. 38-1. Although the incident with Kluh is what sparked two investigations into Plaintiff's allegations of discrimination and harassment, Plaintiff's declaration identifies no circumstances from which the Court can discern why Plaintiff connected the incident to her race or sex rather than a personality conflict. *Id.* Plaintiff's attacks on the IA investigations and her assertions that other individuals were not subject to the same treatment are similarly conclusory and insufficient to meet her burden at summary judgment. She fails to provide specifics regarding alleged incidents involving comparators (such as names, dates, and the nature of complaints) and fails to explain, citing record evidence, why the IA investigations were the result of a biased process, when none of the alleged discriminators were the IA investigators. Moreover, Plaintiff fails to address, citing record evidence, that Norwood recounts many of the same problems with Plaintiff as a Major as the alleged discriminators.

In short, Plaintiff appears to rest her case on her witnesses' observations that "it was known that Black female Officers within the police department did not progress easily in their careers," which is entirely conclusory, Dkt. 38-2, and the fact that she was subjected to discipline, Dkt. 38-2. This is not sufficient to defeat a motion for summary judgment or to establish pretext.

### B.    Title VII Retaliation

A Title VII retaliation case follows the same burden-shifting framework as a discrimination claim. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) that she engaged in protected activity; (2) that the employer took a materially adverse employment action against the plaintiff; and (3) that a causal connection exists between the protected activity and the adverse employment action. *Perkins v. International Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019). If Plaintiff establishes her *prima facie* case, the burden shifts to Defendant to articulate

an LNR and then Plaintiff must ultimately establish pretext or demonstrate that there are genuine issues of material fact suggestive of discrimination.

Plaintiff spends less than one page of her Opposition brief on her retaliation claim. Dkt. 38 at 30-31. Her argument is as follows: "[I]t is undisputed that (1) Reed engaged in protected activity, that MWAA took adverse employment actions against her by putting her in IAs and issuing her letters of reprimand. What is disputed is whether there is a causal connection that exists to show that the adverse employment action was causally connected to her protected activity. Reed argues that it was. See timeline, **Exhibit 17** and **Exhibit 1**, Reed Declaration. MWAA's Motion for Summary Judgment of Reed's Title VII retaliation claims should be denied." *Id.* In this regard, Plaintiff fails to identify any protected activity, does not identify her demotion as one of the adverse actions upon which she premises her claim, and fails to make any argument regarding causation. Moreover, of the two exhibits she cites: (i) Exhibit 17 (Dkt. 39-19) is a timeline that is unsupported by any declaration, where it is unclear who drafted it or what it is based on, and which contains random highlighting in different colors; and (ii) Exhibit 1 (Dkt. 38-1) is her declaration which is entirely conclusory with respect to her retaliation claims. Indeed, many of the incidents reflected on the so-called timeline are not reflected in Plaintiff's declaration, nor do they appear supported with other documentary evidence.

The Court again begins with whether the actions of which Plaintiff complains qualify as materially adverse actions. Here, Plaintiff focuses on the IAs and the letter of reprimand, but the Court examines each of the adverse actions previously discussed. The only action that qualifies as "materially adverse" is Plaintiff's demotion. *See Harris v. Herring*, 2021 WL 100651, at *7 (E.D. Va. Jan. 12, 2021) ("[C]ourts in this circuit have repeatedly held that proposed termination[s], reprimands, performance improvement plans, and negative performance

evaluations do not constitute materially adverse action."). The Court next evaluates whether Plaintiff engaged in a protected activity. Plaintiff identifies no specific protected activity in her discussion of her retaliation claim.[50] Based solely on Plaintiff's declaration it would not be clear that Plaintiff was reporting complaints under Title VII, Dkt. 38-1 ¶¶ 8-9 (not indicating that complaints were pursuant to Title VII), but Defendant has introduced evidence and asserted as undisputed fact that Plaintiff's complaints on April 15, 2020, constituted complaints protected under Title VII. Accordingly, Plaintiff engaged in protected activity.

The Court therefore turns to whether there is a causal connection between Plaintiff's April 2020 protected activity and Plaintiff's July 2021 proposed demotion or September 2021 finalized demotion. There is not, and Plaintiff points to none. There is no temporal proximity between the protected activity and demotion. *See Lorenz v. Fed. Exp. Corp.*, 2012 WL 4459570, at *11 (W.D. Va. Aug. 17, 2012) ("Regarding temporal proximity, the Fourth Circuit has ruled that when 'at least three to four months separated the [materially adverse employment action] . . . and the claimed protected activities' the time period was too long to establish a causal connection on the basis of temporal proximity alone."). Moreover, there is otherwise no inference of retaliation. Plaintiff references no retaliatory statements. Defendant took Plaintiff's allegations seriously and obtained outside counsel to investigate, and that outside counsel found Plaintiff's allegations to be unsubstantiated. Thus, no reasonable juror could find that Plaintiff has established a *prima facie* case of retaliation.

---

[50] The timeline submitted by Plaintiff reflects other potential protected activity. But, as noted *supra*, it is unclear who prepared the timeline, it is unauthenticated, and not supported by any of the documents referred to therein or any other admissible evidence. Thus, the Court cannot rely on the timeline to provide other protected activities as under Rule 56 the Court's review on summary judgment is limited to admissible evidence. Fed. R. Civ. P. 56.

Even assuming that Plaintiff could establish a *prima facie* case of retaliation, Defendant has produced an LNR, and Plaintiff has failed to demonstrate pretext for the same reasons discussed *supra*. Thus, no reasonable juror could find in Plaintiff's favor on her retaliation claim and summary judgment is appropriate.

C.    Section 1983

Plaintiff fails to identify a constitutional right that has been violated pursuant to which she seeks relief under Section 1983. In her Opposition, Plaintiff asserts that Defendant's "discriminatory custom against Black females . . . proximately caused the deprivation of Reed's constitutional right, her employment with MWAA." Dkt. 38 at 30. Notwithstanding this assertion, the Court does not understand Plaintiff to be arguing that she has a constitutional right to employment, but that she has a constitutional right to equal protection that protects against being deprived of her employment in a discriminatory way. Thus, the Court will analyze – as Defendant has done – Plaintiff's Section 1983 claim as resting on Equal Protection.

As Defendant notes, Defendant was created by an interstate compact (the "Compact") to acquire, operate, maintain, develop, promote and protect the Ronald Reagan Washington National and Washington Dulles International airports. *See* 49 U.S.C. § 49101 (2024); Va. Code Ann. § 5.1-153 (2024).; D.C. Code § 9-1001 (2024). Under the Compact, Defendant is "a public body corporate and politic and independent of all other bodies" created for the purpose of "acquiring, operating, maintaining, developing, promoting and protecting Ronald Reagan Washington National Airport and Washington Dulles International Airport." *Gray v. Va. Sec. of Trans.*, 276 Va. 93, 98 (2008). Defendant is treated akin to a municipality. *See Alpine Air, Inc. v. Metropolitan Washington Airports Authority*, 62 Va. Cir. 215, 217 (Fairfax 2003) (Airports Authority's immunity "is equivalent to the immunity that municipalities enjoy under Virginia common law.").

35

For purposes of Section 1983, Defendant is also treated akin to a municipality. *See Grayson v. Metro. Wash. Airports Auth.*, 2014 WL 1088812, at *2 (E.D. Va. Mar. 18, 2014).

Because Defendant is treated akin to a municipality, judges in this District have recognized that it "may not be sued under 42 U.S.C. § 1983 for injuries inflicted by their employees absent an official custom, policy, or practice in the municipality that proximately caused the deprivation of the plaintiff's constitutional rights." *Mukuna v. Gibson*, 2011 WL 3793336, at *5 (E.D. Va. Aug. 25, 2011). There are four ways in which liability for a policy or custom may arise: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law. *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). An equal protection claim under the Fourteenth Amendment requires a plaintiff to show that the challenged government action has "a racially disproportionate impact" and is "motivated by an invidious discriminatory intent." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 883, 886 (4th Cir. 2023). "Proving the motivation behind official action is often a problematic undertaking." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

Plaintiff concedes that she must demonstrate that Defendant had an official policy or custom and attempts to demonstrate that there was a custom of "discriminating against Black females" through the declarations of Plaintiff, Gravely, Anderson, Lockhart, and Doomes. Dkt. 38 at 30. But, as discussed *supra*, those declarations are vague and conclusory. Moreover, although Plaintiff frames her argument in terms of a custom by the "Department," Plaintiff fails to identify any of the specifics about this custom including how it is enforced and how it applies

36

outside of the allegations in this specific case. Moreover, Plaintiff's own promotion to Major would seem to undercut the contentions regarding a policy or custom contained within the declarations that she cites. Indeed, the declarations submitted by Plaintiff suggest that individuals employed by Defendant were trying to increase minority recruitment. Dkt. 38-2 (HR employee stating she "was passionate about recruiting for highly qualified diverse candidates from the local area and to ensuring the recruitment, hiring and promotional processes were standardized to be fair and equitable"); Dkt. 38-3 (indicating "Deborah Lockhart and I pushed for more minority recruitment"). These declarations are also consistent with Norwood's affidavit. *See* Dkt. 29-2 ("I believed it was important to promote more diverse candidates"). Defendant also had official policies precluding discrimination. Dkt. 29-8. Thus, far from demonstrating that there was a persistent and widespread policy, the evidence on this summary judgment record demonstrates that there was a concerted effort to increase minority recruiting. As the Fourth Circuit has held, "[s]poradic or isolated violations of rights will not give rise to [municipal] liability; only widespread or flagrant violations will." *Owens v. Balt. City State's Atty's Off.*, 767 F.3d 379, 403 (4th Cir. 2014). Thus, on this summary judgment record, no reasonable juror could find that Defendant violated Section 1983 as alleged in Count 1.

With respect to Plaintiff's Section 1983 retaliation claim, the Fourth Circuit has held: "Neither our Court nor the Supreme Court has recognized an equal protection right to be free from retaliation. To the contrary, we have previously held that '[a] pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause.'" *Wilcox v. Lyons*, 970 F.3d 452, 458 (4th Cir. 2020). Instead, the Fourth Circuit has consistently considered retaliation claims brought under Section 1983 to be more properly characterized as claims asserting a violation of the First Amendment. *See Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017). Because Plaintiff – who is

represented by counsel – failed to plead any Section 1983 cause of action premised on a violation of the First Amendment, Plaintiff's claim necessarily fails and no reasonable juror could find in her favor. Indeed, Plaintiff's Opposition appears to concede that she cannot state a Section 1983 retaliation claim because she failed to respond to this argument or otherwise address her Section 1983 claim at all. *See generally* Dkt. 38.

## VI. CONCLUSION

In short, Plaintiff has failed to demonstrate any genuine issue of material fact, and Defendant is entitled to judgment on each count of the Amended Complaint.

Accordingly, it is hereby ORDERED that the MSJ (Dkt. 28) is GRANTED; and it is

FURTHER ORDERED that the MTS (Dkt. 41) is DENIED; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to enter Rule 58 judgment in favor of Defendant and against Plaintiff on each count of the Amended Complaint and to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
March 27, 2026

_____/s/_____
Rossie D. Alston, Jr.
United States District Judge

38